HOOPER, Chief Justice
(concurring in the result, but disagreeing with part of the rationale):
The majority’s opinion purports to harmonize § 8-8-5 and § 5-19-4, Ala.Code 1975. In truth, this “harmony” eviscerates portions of § 8-8-5 and very well may permanently sear Alabama’s consumer loan industry. Section 8-8-5 specifically defines “interest” as including “all direct or indirect charges imposed as an incident to a loan,” and allows unlimited interest rates on loans of amounts “not less than $2,000.” Ala.Code 1975, § 8-8-5(a), (c). Loan “points” are obviously charges incident to a loan and, under this statute, are limited only by consumer preference in the loan market and the laws of unconscionability. Because consumers may freely negotiate charges on loans of amounts over $2,000, they may freely negotiate loan points. Such a reading comports with the bedrock principle of statutory interpretation that “[wjords used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.” IMED Corp. v. Systems Engineering Associates Corp., 602 So.2d 344, 346 (Ala.1992) (emphasis added). The per curiam opinion purports to effectuate the “literal language” of both statutes by allowing unlimited interest, while capping loan points. Clearly, however, this reading-is not borne out by the “literal language” of § 8-8-5.
As Justice Houston points out in his special writing, § 5-19-4(g) has no effect on the provisions of § 8-8-5. The plain language of § 5-19-31(b) states that the Mini-Code “shall not be construed to amend or repeal, without limitation, ... Section 8-8-5.” Yet the majority deletes from § 8-8-5 the Legislature’s clear mandate that charges incident to a loan of an amount over $2,000 are to *897 remain freely negotiable. The per curiam opinion states that by construing the statutes in pari materia, the majority has managed to “give effect to both provisions, without repealing, amending, or modifying § 8-8-5.” 708 So.2d at 894. In reality, the opinion modifies the provisions of § 8-8-5 to say that charges incident to a real estate loan over $2,000 are not freely negotiable.
This reading conflicts not only with the clear statutory language of § 5-19-4(g), but with Justice Almon’s conclusion in Williams v. E.F. Hutton Mortgage Corp., 555 So.2d 158, 160 (Ala.1989), that “§ 8-8-5 exempts such loans [of $2,000 or more] from the application of ‘any law of this state otherwise prescribing or limiting [the] rate or rates of interest’ paid on such loans.” There can be no reasonable doubt that § 8-8-5 is the exclusive authority in this case.
The per curiam opinion not only violates the fundamental principle of statutory construction that words are to be given their plain meaning; it also disregards the principle of expressio unis est exclusio alterius. This long-standing principle holds that in statutes the expression of one specific thing implies the exclusion of other specific things. Section 8-8-5 allows parties to negotiate the rates of interest in a transaction, with the caveat:
“[P]rovided further, that all laws relating to unconscionability in consumer transactions including but not limited to the provisions of Chapter 19 of Title 5, known as the Mini-Code, shall apply to transactions covered by this section.”
Ala.Code 1975, § 8-8-5(a). The Legislature specified that the only law that could control § 8-8-5 is the unconscionability law of the Mini-Code. The other provisions of the Mini-Code, including § 5-19-4(g), are thereby excluded.
The construction of § 8-8-5 and § 5-19-4(g) adopted by the Court of Civil Appeals is the correct one. However, this Court’s per curiam opinion refuses to adopt this most natural construction. Instead, the majority makes loan points out to be some sort of bizarre creature reminiscent of the Minotaur, the half-man, half-bull of Greek mythology. According to the per curiam opinion, loan points are at once a finance charge and an interest rate. The opinion states:
“Section 8-8-5(a) .applies to the total amount of interest on a loan; § 5-19-4(g) applies only to points, which are simply one example of a ‘finance charge’ as defined by § 5-19-1(1). They presumably may be one component of a permissible rate of ‘interest’ as defined by § 8-8-5(c).”
708 So.2d at 893. If loan points are “one component of a permissible rate of ‘interest’ as defined by § 8-8-5(c),” then the natural assumption is that they are also controlled by § 8-8-5(a). But the majority then reads them to be “one example of a ‘finance charge’” subject to the restrictions of § 5-19-4(g). Such an interpretation is convoluted at best and disregards the plain meaning rule.[5]
. The per curiam opinion’s justification for this interpretation is that the interpretation by the Court of Civil Appeals would leave § 5-19-4(g) without application. On the contrary, § 5-19-4(g) is left to operate in the territory for which the Legislature created it — small consumer loans. I would contend that every day in this state consumers borrow amounts under $2,000 with the loans being secured by mortgages on real property. One example of such a mortgage would be one given when a person borrows money to pay for home repairs; the consumer may not have the necessary cash but borrows a small amount of money with the loan being secured by a mortgage on .his home. Consumers who do not have even a relatively small amount of ready cash are often forced to borrow amounts under $2,000. These are the consumers the Legislature intended to protect with the points cap of § 5-19-4(g). They will still be protected by § 5-19-4(g). The per curiam opinion, though, seems unable to accept the idea that the Legislature might pass a statute of limited scope. The *898 Justices concurring with that opinion would rather substitute their own judgment and expand § 5-19-4(g) into the areas they deem proper rather than follow the Legislature’s own statute.
While consumers borrowing less than $2,000 are protected by § 5-19-4(g), consumers like the Watleys, who borrow more than $2,000, are protected under § 8-8-5 by our free market system. In our laissez-faire economy, creditors respond to the demands of their customers. Quite simply, a creditor who charges excessive loan points will not have customers. This Court’s opinion, however, prefers government intervention in the mortgage loan marketplace to the operation of the free market.
In a very cogent amicus curiae brief, the Alabama Bankers Association, which consists of 168 banks doing business in Alabama, highlighted the practical impact a reversal of the Court of Civil Appeals judgment would have on the mortgage-loan marketplace. These banks know better .than anyone else the need for clarity in the application of § 8-8-5 and § 5-19-4(g). As their brief stated:
“Every day, banks rely on the clear scope and operation of Section 8-8-5 in numerous transactions. It is of utmost importance that the law related to charges on credit transactions provide clear and unambiguous instruction to both creditors and consumers.”
The confused reading this Court has given those Code sections today will not provide the guidance the banks seek.[6] With a ruling that loan points, while a “component” of interest, are excluded from the operation of §. 8-8-5(a), the obvious question becomes: What other loan charges are excluded as well? The amicus brief further elaborates on the daily implications of the majority’s decision, stating:
“The stability and certainty offered by Section 8-8-5 is crucial for the sale of Alabama loans in the secondary market. Injection of uncertainty and ambiguity would be detrimental to these sales and would adversely affect the flow of money to, and availability of credit in, this state.”
I fear that the majority’s ruling will injure all concerned — harming not just our loan industry, but also the consumers of this state who will find it much more difficult to obtain credit.
This Court today has taken upon itself the job of amending the clear language of § 8-8-5. The majority feels that this is necessary under the “golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result.” Fletcher v. Tuscaloosa Federal Savings & Loan Ass’n, 294 Ala. 173, 176, 314 So.2d 51, 53 (Ala.1975). What is reasonable to this Court may be very unreasonable to the banking and mortgage lending industry. And in following a court-made rule of statutory interpretation, the majority has violated a fundamental principle of our state government— that the power to legislate lies with the Legislature, not this Court.
In sum, I would affirm the Court of Civil Appeals’ holding that the points cap of § 5-19-4(g) has no application to loans over $2,000 secured by real property. Section 8-8-5 is the exclusive authority for such loans. This Court is bound to adopt such a construction because it comports with the plain meaning of the statutes. Any change to this plain meaning must be made by the Legislature, not by this Court. I disagree with the rationale of the' per curiam opinion because it disregards this plain meaning and clearly modifies § 8-8-5 by applying § 5-19-4(g), in violation of § 5-19-31(b).
SEE, J., concurs.

. The per curiam opinion characterizes loan points as being one more example of a § 5-19-1(1) "finance charge.” I would note that § 5-19-3(e) limits the maximum finance charge allowed, but also clearly states that its limitation does not apply to loans over' $2,000 because those loans are controlled by § 8-8-5.

. I question how the banking industry can find any guidance at all in an opinion that states, "[D]iscount points cannot constitute the entire interest on a loan, but may only be a component of the total finance charge, not to exceed five percent.” 708 So.2d at 892. (emphasis original).